**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| APC FILTRATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 07-CV-1462 |
| | ) | |
| WILLIAM A. BECKER and | ) | District Judge Robert M. Dow, Jr. |
| SOURCEONE PLUS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff APC Filtration, Inc.'s ("APC") motion for partial summary judgment on Counts III and VI [87], and on Defendants William A. Becker and SourceOne Plus, Inc's ("SourceOne") summary judgment motion as to all counts [109]. For the following reasons, the Court grants Plaintiff's motion for partial summary judgment [87] and denies Defendants' motion for summary judgment [109] as to Counts III and VI.

**I.    Background**

   **A.    Factual Background**

APC is a Canadian corporation incorporated in the province of Ontario. APC engineers and manufactures filters and bags for various types of industrial, commercial, and domestic vacuum cleaners. Russell Kelly is the President of APC, and Athanasia "Tammy" Kelly is the Chief Financial Officer. APC employed William Becker from January 2002 until January 31, 2007. At the time that his employment with APC ended, Becker was APC's National Sales Manager.[1] In 2006, Becker earned approximately $171,000 in salary and commissions and

---

[1] The parties dispute the timing of Becker's promotion to National Sales Manager. APC claims that it promoted Becker to the position of National Sales Manager in late 2003, while Becker maintains that he wasn't promoted until 2005. That dispute is not material to the disposition of this motion.

1

received a $19,034.24 severance package from APC upon his termination. He is now President of SourceOne Plus, Inc., an Illinois corporation that competes against APC in the janitorial and sanitary supply market ("the Jan-San market").

APC manufactures filters and bags for vacuum cleaners for two primary markets: "original equipment manufacturers" and "aftermarket" customers. Original equipment manufacturers order vacuum bags or filters that are tailored to a particular manufacturer's specifications and printed with that manufacturer's own part number or brand name. Aftermarket customers order replacement bags or filters that are designed to be used with original equipment vacuums; generally, these bags and filters are not printed with an original equipment manufacturer's part number or brand name, although they do identify which vacuum each bag will fit. APC's aftermarket brands include Janitized, VacFx, and Janitized Plus.

Beginning in approximately 2004, Becker created a sales and marketing program for APC to present to potential aftermarket customers. Between 2004 and January 2007, Becker managed and ran the aftermarket program on behalf of APC. Also beginning in 2004, Becker hired, trained, and managed all sixteen of APC's contracted Manufacturer's Representative Groups who sold APC's Janitized products throughout the United States and Canada.

Except for internal financial and payroll information, Becker had access to all of the password-protected databases containing APC's business information, including product information and profit margins, pricing (including "deviated" or specialized pricing), customer lists, and customer contact information, preferences, and purchase history. APC stored all of this information in its "ACT" database, a customer contact management system. Other than the Kellys, Becker was the only APC employee who possessed a password that would give him immediate access to APC's computer databases.

APC's supply chain consists primarily of Chinese companies. In mid-May 2006, Becker contacted a former APC employee, Yanlin Hou, to discuss going into business with one of APC's major Chinese suppliers, Zehua. On May 12, 2006, while still employed by APC as its National Sales Manager, Becker sent an e-mail to Ms. Hou stating, "Have you received any additional feedback from any Chinese manufacturers yet regarding sales in the US * * * * I am still uncertain about APC, so I have to be very careful. Please make certain not to mention my name to Adamn or anyone." On May 15, 2006, Ms. Hou responded to Becker's May 12, 2006 e-mail with a proposal for a business relationship between Becker and Zehua in which Zehua would supply Becker directly and Becker would act as an agent of Zehua. On May 16, 2006, Becker sent another e-mail to Ms. Hou stating, "It is a plan I will need to think about. Sounds interesting. However, I think the aftermarket would be necessary as well. A lot of business could happen there as well. Would ZH no longer sell to APC?"

Becker communicated by telephone and e-mail with both Hou and Adamn Chang, the president of Zehua (and his assistant Candy), from May through September or October 2006, to negotiate the terms of the eventual contract between Becker and Zehua. The e-mail communications exchanged between Becker, Hou, Chang, and other representatives of Zehua contained pricing and marketing strategies. The e-mail communications between Becker, Hou, and Zehua are not retrievable because they were stored on a computer that Becker destroyed in approximately March 2007, after this lawsuit was filed.

On September 10 and 11, 2006, while he was still employed by APC as its National Sales Manager, Becker traveled to China to visit Zehua's factory and negotiate the final terms of the agreement between Zehua and SourceOne. After he returned, he and Zehua finalized the terms of the contract between SourceOne and Zehua and eventually entered into an exclusive contract

in which Zehua would supply SourceOne with filters and bags and Becker would act as an agent of Zehua to both original equipment manufacturers and aftermarket customers. The contract between Zehua and SourceOne contains a provision stating that within six months of the execution of the contract, Zehua must stop supplying APC.

In early December 2006, after having taken steps to set up SourceOne, including securing e-mail and mailing addresses and applying for a registered trademark for "Green Klean,"[2] Becker placed an order worth $30,000 with Zehua. Then, in January 2007, while still employed by APC, Becker sent Green Klean vacuum bags to the same expert used by APC to test its bags. He also made arrangements with a warehouse in Park City, Illinois, to receive, store, and transport SourceOne's products. On January 24, 2007, Becker instructed the warehouse to set aside 200 cartons of vacuum bags from Zehua's first shipment. Those bags were ultimately sent to one of APC's customers, Flint Cleaning.[3]

On March 27, 2007, Zehua informed APC of its intention to stop supplying APC with products. According to the Kellys, APC has been unable to locate a supplier to replace Zehua and instead, at greater expense, has had another one of its suppliers temporarily fill the void in its supply chain left by Zehua.

Since 2005, AmSan has been a customer of APC.[4] Until he was fired in January 2007, Becker was APC's only contact with AmSan's corporate office. In 2005, Becker began

---

[2] "Green Klean" is the name Becker intended to use to market aftermarket vacuum filters and bags on behalf of SourceOne and in direct competition with APC's Janitized line.

[3] Becker's phone records indicate that he contacted Flint Cleaning in October, November, and December 2006. The aftermarket bags that Becker sold to Flint were ordered in December 2006 and were labeled with the prefix "FC." However, Becker maintains that he did not solicit Flint Cleaning until February 2007.

[4] AmSan is in the business of distributing janitorial and sanitation products on a nationwide level.

soliciting all of AmSan's corporate vacuum bag business on behalf of APC, including AmSan's specialized aftermarket brand line – "Renown" – as well as AmSan's general aftermarket business. In early 2006, APC sent AmSan Janitized samples and samples made for AmSan's "Renown" brand, and Becker discussed with D.J. Christensen, AmSan's President of Merchandising, the possibility of a rebate program and specialized pricing. In March and April 2006, Becker noted in the ACT database that AmSan was very close to entering into a business relationship with APC. However, on May 24, 2006, Becker noted that AmSan had been acquired by another company and APC's negotiations with AmSan were put on hold.

At his deposition on July 24, 2007, Becker testified that he had no contact with Christensen between September 13, 2006 and late January 2007.[5] While Becker sent no emails and had no other contact with Christensen concerning APC's attempt to obtain AmSan's business, third party discovery showed that during that time period, while Becker was still employed by APC, he and Christensen sent or received approximately sixty e-mails and had several telephone conversations with each other and with another representative of Interline, Lisa Blum, concerning Becker's attempt to obtain AmSan's business on behalf of SourceOne.[6] In these e-mails, bag types and quantities were discussed,[7] and Becker provided AmSan with a

---

[5] Becker also falsely denied having any contact with AmSan on behalf of SourceOne while he was still employed by APC in his verified answer, verified answers to interrogatories, responses to requests to admit, and his affidavit of March 20, 2007.

[6] For example, on September 14, 2006, Becker sent an e-mail to D.J. Christensen from his "GoS1S2aol.com" e-mail account stating, "D.J., Thanks for your time on the phone. Here is an email address you or Lisa can use for now. My phone number will remain the same."

[7] On November 19, 2006, Becker sent Christensen an e-mail stating, "Here is the revised pricing. You'll note the pricing is in all cases lower than the Janitized pricing originally given even thought [sic] the volumes are smaller . . . . In addition to these bags, which by the way are the most popular, there will also be other Green Klean bags available."

number of price and product lists.[8]  He also negotiated price reductions and discussed terms of payment and a volume rebate agreement.  In at least two e-mails, Becker informed AmSan that SourceOne's pricing was below APC's pricing.

On January 26, 2007, five days before APC fired Becker, Christensen sent an e-mail to other AmSan employees, including division branch managers, announcing that SourceOne would be AmSan's new supplier of "a new general line vacuum bag."  Her e-mail also stated, "You will find that the costs for these bags will not only be lower than your current major equipment brand but also lower than one of the more recent to market prominent bag suppliers, APC Filtration." While communicating with AmSan, Becker did not advise Christensen that he was still employed by APC.  Christensen testified that Becker told her he was with a "new company," and she concluded that APC did not want a relationship with AmSan because no one from APC contacted her after Becker began soliciting the AmSan business on behalf of SourceOne. AmSan executed a contract with SourceOne with an effective date of February 5, 2007.

In the fall of 2006, Becker contacted former co-defendant Kevin Sullivan, the President of Prime Line, Inc. ("Prime Line"), about working with Becker for SourceOne.[9]  Prime Line, one of APC's Manufacturer's Representative Groups, had a written agreement with APC containing a non-solicitation clause.  The agreement, in effect since August 15, 2004, renewed automatically on a year-to-year basis.  At the time Becker spoke with Sullivan about working with SourceOne, Prime Line's contract with APC was in effect.  In the fall of 2006, Becker and

---

[8] On January 26, 2007, while still employed by APC, Becker sent Christensen the following e-mail: "Attached is our ful current price sheet for Commercial Vacuum Cleaner bags available for AMSAN. These are the prices all distributors would see.  These prices are 10% lower than the APC prices in the 20+ case column.  Additionally, SourceOne pays the freight on $600 orders (not 20 case orders)."  Becker created the SourceOne price sheet attached to this email in September 2006.

[9] On June 26, 2007, APC Filtration and Kevin Sullivan and Prime Line, Inc. filed a Joint Stipulation of Dismissal with prejudice.

6

Sullivan agreed that they would contact some of APC's current customers about purchasing vacuum bags from SourceOne. While his agreement with APC was in effect, Sullivan solicited APC's customers on behalf of SOP and Zehua North America.

### B. Procedural History

Prior to the reassignment of this case, Judge Gettleman entered a temporary restraining order [Dkt. No. 17] and a preliminary injunction [107] against Source One and Becker. Magistrate Judge Ashman issued orders [101, 135] imposing sanctions in the amount of almost $100,000 against both Defendants. Both judges have expressed their dismay over Becker's conduct during the course of this litigation. Judge Gettleman concluded that Becker "purposefully destroyed evidence in this case and continually lied about it." 10/23/07 Trans. at 10-11. Magistrate Judge Ashman found that Becker "willfully destroyed relevant evidence," "violated the Court's June 28, 2007 discovery order," and "acted in bad faith to prevent APC from discovering damaging evidence." 12/21/07 Order [135] at 2 (summarizing 10/12/07 Order).

In addition to the summary judgment motions [87, 109] addressed in part in this opinion, the Court has before it two motions [150, 157] for rules to show cause why Defendants should not be held in contempt for alleged violations of the preliminary injunction order. In view of all of the pending motions, the Court set this case for status in June to ask whether the parties had any interest in a global settlement of this litigation prior to the disposition of the pending motions. The parties agreed to discuss settlement, but subsequently advised the Court that they were unable to reach accord.

In view of that communication from the parties, the Court turned to the disposition of the summary judgment motions. However, mindful of Plaintiff's expression of "great doubt about

7

defendants' ability to satisfy [a large] judgment" and its observation that "[s]hould APC obtain partial summary judgment" with respect to the $174,195.92 that it paid Becker while he was breaching his duties, APC would be in position to "make a rational business decision whether or not the cost of additional litigation would be worth obtaining a substantially larger judgment which would most likely be uncollectible" (APC Reply at 15), the Court addresses in this opinion only the summary judgment motions on Counts III and VI.

## II. Discussion

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

### A. Breach of Fiduciary Duty (Count III)

In order to prevail on its breach of fiduciary duty claim against Becker, APC must establish that Becker: (1) owed a fiduciary duty to APC; (2) that he breached that duty; and (3) that his breach of that duty proximately damaged APC. *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000); *Polansky v. Anderson*, 2006 WL 2038603, at *3 (N.D. Ill. July 19, 2006). In his response to APC's summary judgment motion (at 3), Becker concedes the first two elements of this claim. Therefore, the only issue before the Court is whether Becker's breach of his fiduciary duty proximately damaged APC.

APC argues that the following conduct supports its position that Becker's breach proximately damaged APC: (1) setting up SourceOne, a rival business; (2) entering into a contract with APC's Chinese supplier Zehua that contained a provision stating that within six months of the execution of the contract, Zehua must stop supplying APC; (3) soliciting APC's current and prospective customers; and (4) enticing an APC manufacturer representative to breach its contract with APC. In response, Becker contends that APC has not been damaged because: (1) there are no damages resulting from Becker's breach of fiduciary duty with respect to AmSan; (2) Becker was free to enter into a contract with Zehua because Zehua's identity was not a trade secret; and (3) Becker was unaware of Prime Line's contract with APC and, in any event, his dealings with Kevin Sullivan were "peripheral."

Although Becker has conceded the first two elements of a breach of fiduciary claim, the following timeline is helpful in assessing how Becker's actions have damaged APC:

- May 12, 2006 – Becker contacts Yanlin You to discuss entering into a business relationship with APC's supplier, Zehua.[10]

- May through October 2006 – Becker contacts his attorney to discuss whether setting up a competing business would violate his contract with APC.

- August 21, 2006 – Becker renames an existing inactive corporation, SourceOne Plus, Inc., to better reflect the business he intended to go into.

- September 10-12, 2006 – Becker travels to China to meet with Zehua and finalize his contract with Zehua.

- September 13, 2006 – Becker makes his last note in APC's ACT database regarding contact with AmSan on behalf of APC, stating that he left a voicemail with D.J. Christensen.[11]

- September 14, 2006 – Becker speaks to D.J. Christensen of AmSan and gives her his SourceOne email address.

- September 26, 2006 – Becker executes an exclusive contract with APC's supplier, Zehua, which includes a specific term that Zehua cut APC off.

- September 28, 2006 – Becker creates a SOP price list using APC software.

- September 2006 through January 2007 – Becker exchanges no fewer than sixty e-mails with D.J. Christensen to solicit AmSan's business on behalf of SOP.

- October 17, 2006 – Becker sets up a mailbox and mailing address for SOP.

---

[10] Pursuant to Magistrate Judge Ashman's Order of October 12, 2007, "It is deemed conclusively proven that Becker communicated electronically and in person with Zehua in order to induce Zehua to enter an exclusive supply agreement with SourceOne. These communications took place at least as early as May 2006." 10/12/07 Order at 11.

[11] Pursuant to Magistrate Judge Ashman's Order of October 12, 2007, "It is deemed conclusively proven that Becker communicated with AmSan at least as early as September 2006 in order to solicit AmSan's future business for SourceOne rather than APC." 10/12/07 Order at 11.

- November 9, 2006 – Becker applies for a trademark for the name of his aftermarket line of vacuum bags, "Green-Klean."

- December 2, 2006 – Becker places his first order for product from Zehua on behalf of SOP, totaling approximately $30,000.

- January 2007 – Becker tests Green-Klean bags with the same expert APC uses to test its Janitized bags.

- January 15, 2007 – SOP's first order of product from Zehua leaves China for shipment to the United States.

- January 24, 2007 – Becker retains a warehouse to store and transport SOP's products. One order is set aside to be sent to one of APC's current customers, Flint Cleaning Supplies.

- January 26, 2007 – SOP is awarded the AmSan contract.

- January 31, 2007 – APC terminates Becker.

Employees are permitted to "plan, form, and outfit a competing corporation while still working for the employer." *Veco Corp. v. Babcock*, 611 N.E.2d 1054, 1059 (Ill. App. Ct. 1st Dist. 1993). However, an employee must be careful not to go beyond the preliminary stages of setting up his business by actually commencing business and competing with his employer. See *id*. As the timeline illustrates, Becker clearly crossed the line between permitted and prohibited conduct by an employee.

The Court also concludes that APC unquestionably has been significantly damaged as a direct and proximate result of Becker's breaches of his fiduciary duty to APC. First, APC paid compensation and reimbursed Becker for regular business expenses from the time that he began breaching his fiduciary duties (no later than May 2006) until his termination on January 31, 2007. APC also paid Becker a severance package of $19,034.24. Under Illinois law, an employer may recover an employee's total compensation paid during the time period that the employee was breaching fiduciary duties owed to the employer. See *Veco*, 611 N.E.2d at 1062;

see also *Hill v. Names & Addresses, Inc*., 571 N.E.2d 1085, 1092 (Ill. App. Ct. 1st Dist. 1991) (explaining that an employee who breaches fiduciary duties has no entitlement to compensation during a willful or deliberate course of conduct adverse to the principal's interests). At a minimum, APC has been damaged in the amount that it paid to Becker in compensation, expenses, and severance during the time Becker engaged in a pattern of willful conduct that was adverse to APC's interests, which, according to APC and not meaningfully contested by Defendants, amounts to $174,195.92.

APC also presented evidence that it has been damaged as a result of Becker entering into an exclusive contract with Zehua. Zehua was a major supplier of APC's product, and subsequent to Becker's contract with Zehua, APC has provided evidence that it has been forced to: (1) pay higher supply costs to another supplier to fill the void caused by losing Zehua; (2) travel to China and incur expenses in attempting to find a replacement supplier; and (3) forgo business as a result of being unable to fill orders previously filled by Zehua. Defendants do not dispute this evidence, but counter that because Zehua's existence is not a trade secret, Becker was within his rights to enter into a business relationship with it. But Defendants offer no legal support for the proposition that an employee – consistent with his duty of loyalty – may for his own benefit solicit and enter into a contractual relationship with his employer's principal supplier that prohibits the supplier from continuing to do business with the employer. Nor have Defendants shown that the right to recover for damages caused by a breach of the duty of loyalty is limited to conduct that also unlawfully invades protected trade secrets.

APC also has put forth evidence that APC has lost customers as a result of SOP's ability to undercut APC's prices on the basis of its exploitation of Becker's wrongful conduct. Under Illinois law, an employer is entitled to lost profits and compensatory damages resulting from an

employee's breach of fiduciary duty. See *Veco*, 611 N.E.2d at 1062 (imposing constructive trust on commissions and profits earned from customers former employee took from former employer in breach of his fiduciary duty). Illinois courts have held that "the resignation of an officer will not sever liability for transactions completed after the termination of his or her association with the corporation if the transactions began during the existence of the relationship or were founded on information acquired during the relationship." *Id.*

Based on the foregoing, the Court concludes that Becker's misconduct has in fact damaged APC and therefore summary judgment in favor of APC is appropriate on APC's breach of fiduciary duty claim (Count III). With respect to damages, APC has restricted its request at this time to the award of the $174,195.92 that it undisputedly paid to Becker in compensation, expenses, and severance benefits during the time that Becker was both serving as APC's National Sales Manager and acting contrary to APC's interests in furthering Becker's and SOP's interests.[1] The Court finds that APC is entitled to the requested damages. APC's further request for injunctive relief is addressed later in this opinion.

### B. Violation of the Illinois Trade Secrets Act (Count VI)

To prevail on a claim under the Illinois Trade Secrets Act, APC must establish that the information at issue was (i) a trade secret, (ii) that Becker misappropriated, and (iii) that he used in his business. See *Strata Marketing, Inc. v. Murphy,* 740 N.E.2d 1166, 1176 (Ill. App. Ct. 1st Dist. 2000). Under section 2(d) of the Act (765 ILCS 1065/2(d)), a trade secret is defined as follows:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not

---

[1] The Court agrees with APC that, with further litigation, APC may be entitled to significantly more damages.

13

being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

In determining whether a trade secret exists, Illinois courts also have looked to the following common law factors: (1) the extent to which the information is known outside of the employer's business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his or her competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 1st Dist. 2002); see also *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003).

The protection afforded trade secrets reflects a balancing of conflicting social and economic interests. Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means. See *ILG Industries, Inc. v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971). Nevertheless, in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation. See *Service Centers of Chicago, Inc. v. Minogue,* 535 N.E.2d 1132, 1135 (Ill. App. Ct. 1st Dist. 1989).

APC claims that Becker misappropriated the following information: (1) names and addresses of all customers and potential customers and contact persons; (2) historical sales information, including customer product preferences; (3) details of pending sales quotations; (4)

year-to-date sales figures; (5) product information including customer part numbers; (6) shipping, pricing, cost, and profit margin information for each of APC's product lines; and (7) supplier names, addresses, and contact information. Essentially, APC's position is that Becker competed with APC using APC's customer lists and pricing data. APC stored all of this information in its "ACT" database (which it refers to as a customer contact management system) as well as on its computer network. Other than the Kellys, Becker was the only APC employee who possessed a password that would give him immediate access to APC's computer databases.

Becker argues that this information does not constitute a trade secret because the information was not sufficiently secret to give APC a competitive advantage. Relying heavily on his own affidavit (which the Court is forced to discount because of Becker's prior conduct),[12] Becker asserts that he was entitled to the information he utilized because he contributed to or was responsible for developing this information and because APC failed to take adequate measures to protect the information. But even accepting the proposition that Becker contributed to or developed the information in question, he did so *while he was an agent of APC*. Although the policy of Illinois courts generally has been to encourage competition in the business sector in order to avoid the restriction of any employee's freedom and the possibility of industrial servitude, Illinois courts have found it equally imperative to recognize a protectible business interest where a trade secret exists and either a restrictive covenant agreement has been executed or a breach of confidentiality by an employee has occurred in the course of his employment. See *Revcor, Inc. v. Fame, Inc.*, 228 N.E.2d 742 (Ill. App. Ct. 2nd Dist. 1967); see also *Burt Dickens & Co. v. Bodi*, 494 N.E.2d 817, 819 (Ill. App. Ct. 1st Dist. 1986). "It is generally recognized in

---

[12] In opposition to APC's motion for partial summary judgment, Defendants rely heavily on an affidavit signed by Becker on November 13, 2007. However, this affidavit is, for the most part, the same affidavit that Becker first filed on March 20, 2007, in opposition to APC's motion for a temporary restraining order. It contains many of the same statements that Judge Gettleman already has found to be false.

Illinois that at the termination of employment, an employee may not take with him confidential, particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors." *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir. 1987).

The value of the customer lists and pricing information to APC, as well as its competitors or potential competitors, is obvious and well recognized. See, *e.g.*, *Gillis Assoc. Indus., Inc. v. Cari-All, Inc.*, 564 N.E.2d 881, 885 (Ill. App. 1st Dist. 1990) (customer list is the type of information that the ITSA is intended to protect); *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1117 (Fed. Cir. 1996) (sales data and marketing analysis qualify as trade secrets under ITSA). Obtaining customers through quality products and competitive pricing is the bedrock of most sales industries. A customer list is compiled only gradually and with time. This factor alone may place a newcomer at a great disadvantage with his more established competitor when soliciting accounts. It is not surprising then that such lists come to be regarded as valuable proprietary documents and great precaution is taken to safeguard their confidentiality. Additionally, working out pricing also takes time, strategy, and considerable resources.

In the instant case, APC's customer lists (actual and potential), historical sales information, and pricing information were not readily available to APC's competitors. According to APC, and not disputed by Becker, APC (with the help of Becker) worked for more than twelve years to develop this information. APC created its price lists by obtaining and developing pricing information from salesmen, competitors, through research, and from attending trade shows. Some of APC's price lists, called "deviated" price lists, were tailored to specific customers, based on their needs and their relationships with APC, and were only

available on APC's password-protected computer server and network. Sales data was created based upon years of industry knowledge and experience provided by APC staff (including Becker, while he worked for APC). While a competitor could do the same research to identify companies engaged in the Jan-San market, none of the particularized information could be duplicated without the considerable time, effort, and expense invested by APC. Thus, even if Becker did help develop APC's aftermarket pricing, that was part of his job as National Sales Manager and that information was developed for APC and belonged to APC, not Becker. Becker was not free to use it in competition with APC, *especially while still working for APC*. While the exact expense incurred by APC in developing its customer lists and pricing information is not known at this time, the effort spent to compile and maintain the data and the overall value which this information represented to the company is beyond dispute.

Becker's assertion that APC did not take adequate steps to safeguard its confidential information is made in the face of APC's statements of undisputed fact outlining the steps that it took to protect its confidential information. Since Becker has admitted all of those facts, he instead argues that APC failed to secure a valid and enforceable non-disclosure agreement with him and that APC should have kept all of its trade secret information on a partitioned hard drive to which only its President had access. Both arguments are unavailing.

First, APC's confidential information is entitled to protection under the ITSA regardless of whether an enforceable non-disclosure agreement exists. See *Mangren Research & Dev. Corp. v. Nat'l Chem. Co., Inc.*, 87 F.3d 937, 943 (7th Cir. 1996) (holding that confidential information qualified as trade secrets where there was no confidentiality agreement with former employee defendants, where plaintiff made efforts to protect the secrecy of its trade secrets by, for example, advising employees of confidential nature of trade secrets, requiring other

17

employees to sign confidentiality agreements, and testifying that it required defendant to sign confidentiality agreement); *Dulisse v. Park Int'l Corp.*, 1998 WL 25258, at *3 (N.D. Ill. Jan. 9, 1998) (holding that information qualified as trade secret under the ITSA where, though plaintiff did not have written non-disclosure agreement with defendant, it kept customer and price lists segregated in locked room, and required employees – including defendant – to acknowledge confidentiality policy). In any event, the evidence shows that APC required all of its employees, including Becker, to sign a non-disclosure agreement. APC also enacted a company-wide employment handbook in 2004 that contained a confidentiality policy. In addition, except for internal financial and payroll information, Becker had access to all of the password-protected databases containing APC's business information, including product information and profit margins, pricing (including "deviated" or specialized pricing), customer lists, and customer contact information, preferences, and purchase history. Other than the Kellys, Becker was the only APC employee who possessed a password that would give him immediate access to APC's computer databases. Thus, at a minimum, Becker was aware of his obligations to maintain the confidentiality of APC's business information.

Defendants' contention that only the "very sensitive" documents contained on Russell Kelly's personal laptop computer qualify as trade secrets fares no better. Businesses like APC would be unable to conduct their activities if their employees, such as Becker in his capacity as a National Sales Manager, did not have access to its pricing information and customer lists. In requiring Becker (at least at some point during his tenure) and its other employees to sign a non-disclosure agreement, enacting a company-wide confidentiality policy, subjecting its computer network to password protection, changing its passwords regularly, and restricting access to its network to only certain employees, APC took "efforts that are reasonable under the

18

circumstances" to safeguard its information. *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 215 (Ill. App. 1st Dist. 1995); see also 765 ILCS 1065/2. And that was all that APC was required to do.

In sum, the Court agrees with Judge Gettleman's prior assessment that "what [Becker] did, what he developed, of course those were trade secrets. And he used those in a way that is totally contrary to his obligations as an employee * * * * He was a trusted employee, and he breached that trust. He used the pricing information to get this business from AmSan. He lied about it." 10/23/07 Trans. at 11. For all of the reasons stated above, the Court concludes that Becker failed to honor his obligations to APC during the course of his employment with APC and violated the ITSA. Accordingly, the Court grants Plaintiff's motion for summary judgment as to Count VI.

**III. Conclusion**

As explained above, the Court concludes that Becker crossed the line by competing with APC for customers and suppliers while still employed by APC (see, *e.g.*, *Veco Corp.*, 611 N.E.2d at 1059), and by using APC's customer and price lists to give himself an advantage. The Court grants Plaintiff's partial motion for summary judgment [87] with respect to Counts III and VI and denies Defendants' motion for summary judgment [109] as to Counts III and VI. At this time, the Court enters partial summary judgment with respect to monetary damages in the amount of $174,195.92 to reimburse APC for the compensation, expenses, and severance package paid to Becker while he was in breach of his fiduciary duty. The Court also is prepared to grant relief with respect to Counts III and VI in the form of a permanent injunction with respect to Becker's and SourceOne's solicitation of APC's current customers and use of APC's suppliers. The Court requests that Plaintiff submit to the Court and serve on counsel for

Defendants a draft proposed permanent injunction order, consistent with the law of Illinois and reasonable in scope and duration (see, *e.g.*, 765 ILCS 1065/3), on or before August 18, 2008. Defendants shall have ten days from the date on which they receive the order to submit to the Court and to Plaintiff's counsel any objections that they have to the proposed order.

The Court recognizes that Defendants' motion for summary judgment as to Counts I, II, IV, and V remains pending, as do APC's motions for rule to show cause why Defendants should not be held in contempt for violating the preliminary injunction. At the next status hearing in this case, set for September 10, 2008, at 9:30 a.m., the Court will inquire whether, in light of the cost-benefit calculus noted above (see p. 8, *supra*), APC wishes to pursue the remaining counts in its complaint and/or its request for a contempt hearing on Defendants' alleged violations of the preliminary injunction.[2]

Dated: August 4, 2008

_____
Robert M. Dow, Jr.
United States District Judge

---

[2] The Court also acknowledges Plaintiff's request for attorneys fees pursuant to Section 5 of the ITSA. The ITSA provides in pertinent part that if "willful and malicious misappropriation" exists, the Court "may award reasonable attorneys fees to the prevailing party." 765 ILCS 1065/5. The Court defers ruling on Plaintiff's motion for attorneys fees at this time. See, *e.g.*, *Clinton Co. v. Health Quest Management Corp.*, 1986 WL 405, at *6 (N.D. Ill. July 30, 1986).